245 Cal.App.2d 898 (1966)
Estate of ANDREW NORMAN, Deceased. GEORGE R. OLINCY, as Executor, etc., Objector and Appellant,
v.
ALAN CRANSTON, as State Controller etc., Claimant and Appellant.
Civ. No. 29540. 
California Court of Appeals. Second Dist., Div. Two. 
Oct. 26, 1966.
 Leon B. Brown and J. Dan Olincy for Objector and Appellant. *899
 Charles J. Barry, Walter H. Miller and William R. Elam for Petitioner, Respondent and Cross-appellant.
 HERNDON, J.
 Both the state Controller and the executor of the decedent's will have appealed from the order determining and fixing the state inheritance tax due from this estate. The executor contends that the court below erred in overruling one of his objections to the report of the inheritance tax appraiser and in fixing the tax in an amount $66,752.84 in excess of the $56,595.23 conceded to be due. The Controller argues that there was error in the "striking down" of certain of the Controller's inheritance tax regulations.
 Summary of Material Facts
 On June 21, 1950, the decedent, hereinafter referred to as "Norman," and his attorney, George R. Olincy, hereinafter referred to as "Olincy," executed a declaration of trust, and in July 1950, Norman, as trustor, transferred to Olincy, as trustee, certain voting trust certificates. By the terms of said declaration of trust, Norman reserved the income for his life and after his death to five other persons for their lives. The trust was to terminate upon the death of the last survivor of these named persons and the remainder of the then existing corpus was to be distributed to certain charities. Norman reserved the right to change the life beneficiaries and the remaindermen.
 On January 14, 1952, the assets of the trust consisted of certificates representing one-half of the issued and outstanding shares of Merle Norman Cosmetics, Inc., and the fair market value thereof was $756,250. At that time Norman's assets outside the trust amounted to less than $8,800 and his liabilities amounted to $232,130. These liabilities included an indebtedness on a promissory note for $100,000 held by Jack B. Nethercutt, hereinafter referred to as "Nethercutt," and $70,133 owed to the Collector of Internal Revenue, of which $50,000 was due and payable on January 15, 1952.
 To raise this $50,000, in December 1951, Norman asked Olincy to see if Nethercutt would lend him that amount. Nethercutt at first refused this request, but later offered to buy the remainder interest in the trust for the $50,000 required. After several meetings between Norman and Olincy held for the purpose of determining whether $50,000 was a fair price, Norman finally indicated his willingness to make the proposed sale and instructed Olincy to prepare the papers. Olincy *900 reported this to Nethercutt, but suggested that it would be to the mutual benefit of the parties if (a) instead of denominating the $50,000 as a purchase price, it were advanced as an "interest-free loan" repayable only out of the remainder interest, and (b) instead of transferring the remainder interest to Nethercutt, Norman would transfer it to Nethercutt's sons. Nethercutt agreed to this, and so did Norman.
 The transaction was consummated in the form of a "loan" on the terms suggested by Olincy. The $50,000 was paid to Norman on January 14, 1952, and Norman thereupon paid it to the Collector of Internal Revenue. In consideration of the "loan," Nethercutt's sons, Jack B. Nethercutt II and Robert C. Nethercutt, then minors, were irrevocably designated as remaindermen of the trust and the charities formerly designated to receive the corpus of the trust estate upon its termination were eliminated. Norman died on October 23, 1959.
 The Controller accepts this summary except that he does not agree that any substantial consideration was given for the transfer of the remainder interest to Nethercutt's sons.
 Order of the Probate Court
 The inheritance tax appraiser calculated the date-of-death value of the remainder interest at $505,561.96, and treated it as the subject of a taxable transfer to Nethercutt's sons. The executor filed objections on two grounds: (1) that it was not a taxable transfer, having been made for a full and adequate consideration; and (2) that the date-of-death value had been erroneously computed at an excessive amount.
 The trial court overruled the first objection and held that the 1952 transfer was taxable. This ruling is the subject of the executor's appeal.
 The trial court sustained the second objection and found that the value of the remainder interest at date-of-death was only $393,210.04. This ruling is the subject of the controller's appeal.
 The Executor's Appeal
 The executor concedes that a transfer conforming to Revenue and Taxation Code, section 13641, if made with donative intent, is taxable under sections 13643 and 13644 of the code. Under section 13641, if the transfer is made during lifetime by a resident "for a consideration in money or money's worth, but the transfer is not a bona fide sale for an adequate and full consideration in money or money's worth, the amount of the transfer subject to this part [of the tax] shall be the excess *901 of (a) The value, at the date of the transferor's death, of the property transferred, over (b) An amount equal to the same proportion of the value, at the time of the transferor's death, of the property transferred which the consideration received in money or money's worth for the property transferred bears to the value, at the date of transfer, of the property transferred."
 It is the contention of the executor that the transfer of the remainder interest to Nethercutt's sons on January 14, 1952, the date on which Norman received the $50,000 "loan," was made for a full and valuable consideration. The executor argues (1) that the transfer was made as a part of a business transaction without donative intent, and must therefore be deemed to have been made for a full and adequate consideration, and (2) that retrospective appraisals show that the value of the consideration received by Norman was in fact greater than the value of the remainder interest transferred by him.
 Sufficiency of Consideration
 The trial court found that the transfer "was not made for or in full and adequate consideration equal in money or money's worth to the full value of the remainder interest transferred in that the payment of $50,000 by Jack B. Nethercutt was as is set forth in finding XIV."
 In finding XIV the court found that the transaction "in which Jack B. Nethercutt transferred to Andrew Norman $50,000 without interest, in consideration of Andrew Norman amending his trust agreement of June 21, 1950, and irrevocably designating Jack B. Nethercutt II, and Robert C. Nethercutt to take the remainder interest in the trust agreement of June 21, 1950, after the death of trustor Andrew Norman, Barbara King and Jack B. Nethercutt, was a loan by Jack B. Nethercutt to Andrew Norman and was to be repaid out of the corpus of the trust after the death of Andrew Norman and upon the termination of the trust agreement. That no fair market value on January 14, 1952, of the remainder interest in the trust is herein found for the sum of $50,000 loaned to Andrew Norman by [Jack B.] Nethercutt was a loan requiring repayment thereof and not a purchase."
 [1] The trial court was in error in holding, as a matter of law that the "loan" could not constitute a valuable consideration for the transfer of the remainder interest. It was expressly held in Reidy v. Collins, 134 Cal.App. 713, 720-721 [26 P.2d 712] that "A loan or advancement of money constitutes *902 a valuable consideration" for the transfer of property. Laibly v. Halseth (Wyo.) 345 P.2d 796, is to the same effect. In the latter case the court also said: "In Estrada v. Hanson, 215 Minn. 353 [10 N.W.2d 223, 225, 226], where the making of a loan was questioned as being sufficient consideration, the court said '... The fact she is under obligation to repay the loans does not invalidate them as consideration.' "
 [2] The uncontradicted evidence also shows, as contended by the executor, that the transfer was made as a part of a business transaction, for a valuable consideration, and comes within the rule stated in Estate of Brix, 181 Cal. 667, 678-679 [186 P. 135]: "It is apparent that the parties looked at the transaction from a pecuniary and not a sentimental standpoint. They evidently regarded the consideration as adequate and they were in a much better position to place a value thereon than is this court."
 The value of a true loan as consideration may be very small where it bears a normal rate of interest and is repayable within a short time. Here, however, the "loan" was interest-free and was not repayable until the termination of the trust according to its terms as they read on January 14, 1952. At that time the trust was not to terminate until the death of the last survivor of five named persons. The executor introduced the testimony of a consulting actuary to establish that using the Actuaries' Combined Experience Table of Mortality, the probable duration of the trust as of January 14, 1952, was 46.98 years. Manifestly, the interest-free use of $50,000 for approximately 47 years is a most valuable consideration.
 One Ronald LeRoy, a consulting actuary, testified that if Norman had invested the $50,000 received from Nethercutt at even 4 percent per annum, he would have received $2,000 interest per year and that the value of the right to receive $2,000 per year for 46.98 years was approximately $38,563, an amount almost double the then fair market value of the remainder interest.
 In addition, although the promissory note executed by Norman in Nethercutt's favor constituted an unconditional promise by Norman personally to repay the $50,000, nevertheless it appears not to have been contemplated that the "loan" actually was ever to have been repaid by Norman or his estate. Rather, it was to be repaid out of the assets remaining in the trust upon its termination, and these assets, as indicated, were transferred to Nethercutt or his assignees contemporaneously with the making of the "loan." Thus the note provided that *903 payment was to be made from the principal of the trust estate and "that no repayment hereof shall be made or required during the lifetime of the income beneficiaries of the aforesaid trust estate but that distribution of the trust principal to the ultimate beneficiaries shall be subject to the payment of this sum or the assumption of the obligation to repay at that time."
 Unquestionably the practical effect of these provisions was virtually to eliminate the "borrower's" obligation of repayment and such elimination was immediately worth $50,000 to him. [3] A sum of money is not worth less to the recipient merely because it is called a "loan," where the "loan" is repayable by others or out of assets transferred to the "lender" or his assignees at the time the "loan" is effected.
 Irrespective of the form of the transaction, the direct evidence and all inferences indicate that the transaction between Norman and Nethercutt involved an arm's length sale of the remainder interest for an adequate consideration. Norman obtained a much needed $50,000 and devised a method of delaying delivery of the consideration for that sum of money, so that there would be no pressure on himself or his family. The record is completely devoid of any donative intent on Norman's part.
 The executor introduced expert testimony to establish that the fair market value of the instant remainder interest which would produce no income for 47 years was approximately $20,000 as of January 14, 1952. Of course, this expert conceded that he knew of no market at all for a remainder interest so long deferred, but assuming the existence of a willing buyer and the lowest possible discount rate that might be acceptable, $20,000 was the maximum value thereof. In addition, the expert's opinion was based upon the assumption that the trust principal could not be diminished during the lifetime of the trust. In point of fact, it could be substantially diminished since by its terms the trust instrument directed the trustee after Norman's death to pay funeral expenses, death taxes and debts out of the trust principal if, as would almost certainly be the case, the trust income was insufficient for this purpose. Under such circumstances the fair market value of the remainder interest would be much lower than $20,000.
 Actually these conclusions seem so obvious that the testimony of an expert probably would not be needed to establish them. They fully support Olincy's testimony as to the considerations motivating Norman at the time the transfer was *904 made. Olincy testified: "We [Norman and Olincy] discussed the fact that [the life of the trust] was going to be a very extended period of time because [one of the life beneficiaries] at that time was approximately 30 years of age. Mr. Norman I recall asked me my opinion as to whether I felt that this was a fair price. I told him I thought it was a very generous price for the remainder interest and that I didn't know where he could get as good a price from any other source. Mr. Norman gave thought to this for several days, he didn't come to an immediate decision, and finally he did say that he was willing to make the sale, he wanted me to tell Mr. Nethercutt he was willing to make the sale, and he asked me to prepare the papers in connection with the sale."
 The effect of this transaction was not altered by the fact that for unexplained reasons the parties chose to cast the transfer into the form of an interest-free "loan" repayable out of the property transferred. Of course, we express no opinion as to the consequences with respect to any other tax liabilities of either Norman or Nethercutt or his sons that might have arisen, or that may arise, from this transaction by reason of the form adopted. [4] However, even when considered as a true loan, the value of the interest-free use of $50,000 for 47 years greatly exceeded the fair market value of the remainder interest transferred to the Nethercutts and therefore constituted full and adequate consideration for such transfer.
 The Controller, by making no substantial argument in opposition to the executor's contentions on this point, in effect has conceded their validity. His suggestion that Norman "could well have been motivated by affection for the Nethercutt boys in changing the remainder in his trust from a charitable foundation to them" is wholly speculative and diametrically opposed to the findings of fact and the uncontradicted evidence as to Norman's motives, even though Nethercutt apparently was a nephew of Norman's ex-wife.
 During the trial the Controller offered no evidence directly bearing upon the issue as to the fair market value of the remainder interest at the time of its transfer to Nethercutt's assignees. One witness called by the Controller did testify concerning her computations of the date-of-death valuation of the remainder interest based upon the Controller's regulations relating to Revenue and Taxation Code sections 13953, 13954. However, these computations, while appropriate for determining value of taxable remainders for *905 inheritance tax purposes, have little, if any, bearing upon the market value of the remainder at the time of transfer and concededly they were not introduced for this purpose.
 In view of our determination of the executor's appeal, it is unnecessary for us to consider the Controller's contention that the trial court erred in its holding with respect to the requirements of section 13953 of the Revenue and Taxation Code and the effect of the Controller's regulations in determining the value of the respective interests herein.
 The order is reversed.
 Roth, P. J., concurred.
 FLEMING, J.
 I dissent.
 On a transfer for consideration of a future interest in property to take effect on the termination of a life estate, our statute requires the computation for inheritance tax purposes of the value of the consideration received at the time of the transfer in relation to the value of the future interest given away. Revenue and Taxation Code, section 13641, reads:
 "If a transfer specified in this article is made during lifetime by a resident, or is made during lifetime by a nonresident of property within this State, for a consideration in money or money's worth, but the transfer is not a bona fide sale for an adequate and full consideration in money or money's worth, the amount of the transfer subject to this part shall be the excess of"
 (a) The value, at the date of the transferor's death, of the property transferred, over
 (b) An amount equal to the same proportion of the value, at the time of the transferor's death, of the property transferred which the consideration received in money or money's worth for the property transferred bears to the value, at the date of transfer, of the property transferred." (Italics added.)"
 On valuation of future estates and obligations, Revenue and Taxation Code, section 13953, is controlling:
 "The value of a future, contingent, or limited estate, income, or interest is determined in accordance with the rules, methods, and standards of mortality and value that are set forth in the actuaries' combined experience tables of mortality, as extended, for ascertaining the values of life insurance policies and annuities and for determining the liabilities of life insurance companies, save that the rate of interest used *906 in computing the present value of the estate, income, or interest is four (4) per cent per annum." (Italics added.)
 I agree with the majority opinion that we should accept the transaction in the form in which the parties cast it, that of an interest-free loan to Norman of $50,000, repayable on the termination of the trust, in return for which the lender's sons were irrevocably designated as remaindermen of the trust. Otherwise the transaction would amount to the sale of a capital asset, and Norman's tax liabilities would have increased rather than decreased. But, for the very reason we accept the transaction as a loan, we must recognize and take into our calculations the existence of an obligation to repay it. I also agree that an interest-free loan for a period of years may be valuable consideration and that we should calculate its value on an actuarial basis, as we should likewise calculate the value of the remainder interest given in return for the loan. While there is some doubt as to the period of time for the duration of the trust, whether for five lives or for three, I have tentatively accepted, as did the trial court, appellant's calculations of total life tenancies of 47 years, a time which equals the expectancy of a single life tenant of the age of 12. [fn. 1]
 On these assumptions Norman received a $50,000 interest-free loan repayable in 47 years on the termination of the life estates. At the time he received the loan the present value of his obligation to repay, discounted at 4 percent, was in rounded figures $11,500. Thus the value of the consideration he received amounted to $38,500. In return Norman parted with the remainder interest in over $750,000 worth of property, to take effect in enjoyment in 47 years, the present value of which, discounted at 4 percent, was then approximately $172,500. It seems clear to me that under our statutes less than adequate and full consideration was given Norman for this future interest, because the value of what he gave away was over four times the value of what he received.
 Appellant, however, argues as follows: the present value of $50,000, discounted for 47 years at 4 percent is $11,500, which means that Norman received $38,500 for the property he transferred. However, the present value of the $756,000 he gave up should be discounted for 47 years at 8 percent, and when so discounted only amounts to $20,000. Using these *907 different rates of discount he reaches the conclusion that property worth $38,500 was received in return for property worth $20,000 given up, a more than adequate and full consideration, and hence none of the remainder interest is a taxable transfer of a future interest to take effect in enjoyment after the death of the transferor.
 The basis of this legerdermain is to calculate the benefit of what one gets at 4 percent and discount the benefit of what one gives away at 8 percent, a combination which produces the following bizarre results:
 Present value of $50,000, due in 47 years--$11,500
 Present value of $750,000, due in 47 years--$20,000
 In my opinion the Revenue and Taxation Code, by design, specifically attempts to achieve consistent, uniform results for all calculations of a theoretical nature involving the taxation of transfers of property in which the beneficial enjoyment is to take effect in the future. Any true calculation of relative values must offset 4 percent dollars against other 4 percent dollars in order to arrive at a valid relationship, a conclusion which I find not only logically sound but compelled by our statute, which declares flatly that the present value of a future estate is to be actuarially computed at 4 percent. (Rev. & Tax. Code, 13953.) Under this statute the taxpayer is no more justified in using 8 percent to reduce the amount of his tax than the State Controller would be justified in using 2 percent in order to increase the tax. A consistent, uniform basis of valuation removes taxpayer and government, alike, from the temptation to manipulate figures in order to overreach the other side. If we undertake to compare the present value of a future obligation to repay $50,000 with the present value of a future right to receive $750,000 maturing on the same date, then the value of the latter should always approximate fifteen times the value of the former, and a true calculation of the items will be:
 Present value of $50,000--due in 47 years--$11,500
 Present value of $750,000--due in 47 years--$172,500
 In short, I do not believe our statute permits us to calculate the value of amounts paid at 4 percent and discount the value of future amounts to be received at 8 percent in computing relative values and determining the proportions they bear to one another. What was given away here was over four times as valuable as what was received, and to that extent the excess is taxable as a transfer of property to take effect in enjoyment *908 after the death of the transferor. (Rev. & Tax. Code, 13643, 13644.)
 The other point on valuation in the case is that the trust was subject to an obligation to pay death taxes and all other debts of the trustor and hence was less valuable on an actuarial basis than it appeared to be. It is quite true that the trust had many of the aspects of a testamentary disposition, and that if the trustor had run up extensive debts the trust, at least according to its terms, would have become obligated to pay them. In this respect the trust was not an irrevocable trust at all but was either a revocable trust or a testamentary disposition, and the trustor apparently considered it in this light, for he amended the trust on eight different occasions. But this weakness in the trust is of no value to appellant, for if we accept the logic of a testamentary disposition or a revocable trust, then the entire amount of the future interest would have become taxable on the death of the trustor because no effective transfer of property ever took place earlier. (Rev. & Tax. Code, 13601, 13646, 13951.) But, since both the state controller and the executor accepted the trust at face value as a true irrevocable trust, the court is entitled to do likewise, again at face value.
 I would reverse the case with directions to the trial court to determine on the basis of actuarial tables at 4 percent what proportion of the transfer was made for valuable consideration and what was not and to calculate inheritance tax on the latter. There may be complications in addition to those discussed. For example, in 1958 the trustor amended the trust to eliminate two lives from the duration of the trust. Should this factor be found actuarially significant it would reflect an accelerated vesting of the future interest of the two remaindermen, an acceleration wholly taxable to the extent of its value on the date of the transferor's death. (Rev. & Tax. Code, 13951.) *909
 Based on the same tables, the present value of $1 due on the death of a person 12 years old is 0.22873. (Cal. Admin. Code, tit. 18, Reg. 13952(2), Table B.)
NOTES
[fn. 1] 1. According to Actuaries' Combined Experience Table of Mortality, the life expectancy of a 12-year-old is 47.01 years.